The appellant, James Dwight Cameron, was convicted of assault in the second degree and was sentenced to ten years' imprisonment. The victim of the assault was four-year-old Jeremy Dean. Expert medical testimony established that the child suffered a basilar skull fracture as a result of trauma to the mastoid area (the area of the skull behind the ear). The expert gave his opinion that the trauma was caused by a blunt instrument, such as a hammer or a tire tool. The child was rendered partially deaf as a result of this injury.
 I
The appellant contends that the evidence was insufficient to support the verdict. This contention, as well as the claim made in Part II, requires a brief summary of the evidence.
On the evening of February 19, 1991, the appellant, his sister Annette Cameron, and *Page 122 
his cousin Kenneth Hazelrig, went to a mobile home occupied by Kim Dean, her four children, and her boyfriend Ralph "Bubba" Brown. Several other people dropped in during the course of the evening. The group of adults drank, played cards, and "partied" for awhile, until a fight broke out between the appellant and Bubba Brown in the kitchen. Shortly after the fight ended, the appellant and his sister Annette left.
After the appellant left, another fight erupted in the living room, between Bubba Brown and Kenneth Hazelrig. That fight apparently developed into a general free-for-all, complete with biting and hair-pulling, involving most of the adults present. The evidence was undisputed that four-year-old Jeremy Dean was in the living room during the melee. The brawl continued to the front yard, where somebody produced a tire tool. Witnesses for the defense testified that a small child, who appeared to be crying, was outside during this time. Eventually, the second fight also subsided, the tire tool was left on the ground, and several of the adults, including Kenneth Hazelrig, departed. Hazelrig went to find the appellant and the two of them returned to the mobile home to continue the fight with Bubba Brown. Annette Cameron drove the appellant and Hazelrig, who were both drunk, back to the mobile home. According to Hazelrig, the appellant picked up the tire tool in the front yard, knocked on the door of the mobile home, and asked Kim Dean where Bubba was. When Ms. Dean replied that Bubba was in bed, the appellant, with the tire tool in his hand, started down the hall towards the master bedroom. Hazelrig stated that he saw the appellant enter the master bedroom and that a few seconds later he "heard something hit the bed several times." R. 201-02. Hazelrig testified that the appellant walked out of the master bedroom, a child began to cry, and Annette "walked back there and c[a]me back through there with a . . . little boy . . . screaming and squalling." R. 202. Hazelrig said that the boy had "a big ol' knot . . . behind one of his ears . . . a big ol' knot. Looked like a softball." R. 203.
The appellant then walked into the smaller front bedroom and Hazelrig again heard a noise like "something hitting the bed." R. 203. Then, a "few minutes later Bubba c[a]me out of the bedroom cussing and raising cane about [the appellant] hitting him while he was asleep with a tire tool or stick or something." R. 204.
Kim Dean, Jeremy's mother, admitted that she was drunk most of the evening and that she did not know where Jeremy had been at all relevant times during the various fights. She remembered only that at some point during the evening, she had picked up Jeremy and put him to bed in the master bedroom, in the bed which she and Bubba usually shared.
Lisa Spears, a neighbor of Kim Dean's who was not involved in the events of February 19, but who saw the child the following day, testified that she received three versions of Jeremy's injuries: First, Kim Dean told Ms. Spears that Jeremy said that he had fallen off a table. Then Jeremy himself told Ms. Spears that his brother Josh had hurt him. Finally, Jeremy said that the appellant had hit him with a hammer.
Kenneth Hazelrig testified that after the incident, the appellant admitted to him that "he did it . . . [b]ecause he thought [the child] was Bubba lying in the bed and it was covered up." R. 213.
The State's theory of the case was that the appellant returned to the mobile home to continue the fight with Bubba and, thinking that Bubba was asleep in the master bedroom, mistakenly attacked Jeremy Dean instead. The appellant did not testify, but his theory of the case was that Jeremy Dean had been injured by someone else at some other time that evening, either during the melee in the living room or during the brawl outside.
Viewing the evidence in the light most favorable to the State, as we are required to do, Faircloth v. State,471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, 471 So.2d 493 (Ala. 1985), it is clear that the State presented a prima facie case of the appellant's guilt through the testimony of prosecution *Page 123 
witness Kenneth Hazelrig alone. See O'Neil v. State,605 So.2d 1247 (Ala.Cr.App. 1992).
 II
In a supplemental charge to the jury, the trial court used a hypothetical fact situation to explain circumstantial evidence and reasonable doubt. The appellant argues that the trial court's example so closely paralleled the State's version of the facts in the instant case that it constituted a comment on the evidence and invaded the province of the jury.
The court gave the following supplemental jury charge:
 "It's rarely possible to prove anything to an absolute certainty or to a mathematical certainty. The requirement of the law in criminal cases is beyond a reasonable doubt.
 "Now reasonable doubt is a fair doubt. It's something that's based on reason and common sense. Something that comes from the state of the evidence. Suspicion and conjecture [are] not reasonable doubt. Forced or fanciful theories are not reasonable doubt. Guess or surmise is not reasonable doubt.
 "I will give you an example of something where there would be no reasonable doubt but where a fanciful theory might supply a doubt.
 "If you, Mr. [jury foreman], saw me walk into the jury room with a gun in [the bailiff's] back and, after we went in the room, the door closed, a moment later a shot rang out and a moment later I walked out with a smoking pistol and you stepped in and there lay [the bailiff] shot, I cannot imagine that there could be a reasonable doubt as to who shot [the bailiff].
 "But you could suppose that perhaps there was someone hiding in the ceiling who shot through a piece of the tile or that [the bailiff] seized the gun from me and shot himself and I picked the gun back up and walked out.
 "Those would be fanciful theories. Those would be guess or surmise. Those would not be reasonable doubt.
 "Now a reasonable doubt may arise not only from the evidence in the case, but also from a lack of evidence.
 "A reasonable doubt exists in any case when after careful and impartial consideration of all the evidence in the case the jurors don't feel convinced beyond a doubt or beyond a reasonable doubt of the Defendant's guilt.
 "As I say, we're not talking about mathematical or absolute certainty. Merely beyond a reasonable doubt. That's as close as I can come I think to explaining to you what that term means.
". . . .
 "The example that I have given you of me going into the jury room with [the bailiff] is also a good example of circumstantial evidence because the evidence in that case would be circumstantial.
 "No one would have seen me shoot [the bailiff], but all of the circumstances would point to my guilt because there wouldn't be any other reasonable hypothesis or reasonable theory as to how it could have happened.
 "There could be theories as I say that, you know, that he took the gun away from me, shot himself and I picked the gun back up and walked out. That's I suppose a[n] infinitesimally small possibility, but it's not a reasonable possibility.
 "The idea of someone hiding in the ceiling, lifting a tile and shooting might be a theory, but it wouldn't be a reasonable theory.
 "For circumstantial evidence to convict the circumstances as proven must be such as to exclude any reasonable theory except the theory of the Defendant's guilt.
 "The test is whether or not the circumstances establish to the exclusion of all reasonable doubt the guilt of the Defendant.
 "As I say in many cases there is no — when we're talking about circumstantial evidence, we're talking about as opposed to eyewitness evidence. The words 'circumstantial evidence' sometimes carry a bad connotation. *Page 124 
 "Sometimes the circumstances may be as compelling as those of an eyewitness if they are established beyond a reasonable doubt in the jury's mind from the evidence on the witness stand.
 "Now before you go, may I see the attorneys please?
"(Bench conference on the record:)
"THE COURT: Exceptions from the State?
"[ASSISTANT DISTRICT ATTORNEY]: No, sir.
"THE COURT: Exceptions from the Defendant?
 "[DEFENSE COUNSEL]: Yes, sir, Judge, I would like exception as to your example because of the close proximity to this case, to the facts of the case.
 "THE COURT: Your exception is noted, but denied." R. 399-403.
The attorney general argues that the appellant waived the issue of whether the foregoing charge invaded the province of the jury "by stating other grounds [for his objection] at trial." Brief of the Appellee at 7. We think that the objection was specific enough to encompass the grounds asserted on appeal. Although the appellant did not use the "magic words" ("invasion of the province of the jury," or "comment on the evidence") in stating his objection, the court was sufficiently "inform[ed] . . . of the legal basis of the objection, thereby affording the trial judge an opportunity to reevaluate his . . . [charge] in light of the grounds alleged and to change it, if deemed necessary." Felder v. State, 593 So.2d 121, 122
(Ala.Cr.App. 1991) (quoting Ex parte Webb, 586 So.2d 954, 957
(Ala. 1991)).
It is well-settled that "the instructions of the court in a criminal prosecution must not invade the province of the jury." 23A C.J.S. Criminal Law § 1293 at 198 (1989). The federal courts retain the power granted judges at common law to comment on the evidence and to express opinions on the facts. SeePatton v. United States, 281 U.S. 276, 288, 50 S.Ct. 253, 254,74 L.Ed. 854 (1930). Alabama, however, follows the rule that a judge may not comment on the evidence. Ala. Code § 12-16-11
(1975) ("[t]he court may state to the jury the law of the case and may also state the evidence when the same is undisputed, but shall not charge upon the effect of the testimony, unless required to do so by one of the parties"); Rule 21.1, A.R.Crim.P. ("[i]n charging the jury, the judge shall not express his opinion of the evidence"); C. Gamble, McElroy'sAlabama Evidence, § 469.01 at 1030 (4th ed. 1991) ("[i]n charging the jury, it is the duty of the trial judge not to indicate, by the matter or manner of his charge, what his own views are as to the effect of the testimony").
In Ex parte Brown, 581 So.2d 436 (Ala. 1991), the trial court summarized disputed evidence from the State's viewpoint and then instructed the jury to render a verdict of guilt if it believed that summary. The Alabama Supreme Court held that the court's one-sided summary was, in effect, a forbidden comment on the evidence and a general affirmative charge requiring reversal.
Here, the trial judge did not summarize the evidence from the State's viewpoint. The court did, however, provide a hypothetical example of circumstantial evidence and lack of reasonable doubt that corresponded, partially in fact and fully in legal effect, with the testimony of State's witness Kenneth Hazelrig.
In Howell v. State, 618 So.2d 134 (Ala.Cr.App. 1992), this court recognized that the use of hypothetical questions on voir dire questioning of the jury " 'is of doubtful propriety, certainly where one aspect of the putative evidence is singledout. . . .' Ward v. State, 44 Ala. App. 229, 253, 206 So.2d 897,921 (1966), cert. denied, 281 Ala. 650, 206 So.2d 922 (1967)."Howell v. State, 618 So.2d at 138 (emphasis added). However, we determined that no prejudice was shown in Howell because the particular question was not inherently prejudicial and because the trial judge stated to the jury that he did not think the prosecutor "proposes that [his hypothetical question] embodies the theory of the State's case." Howell, 618 So.2d at 138. Here the trial *Page 125 
judge did not state to the jury that his hypothetical example embodied the theory of the State's case. However, the jury could have interpreted the court's example, which coincided closely with the State's version of the facts, to mean that the trial judge rejected the defense's version of the facts as a "fanciful theory" based on nothing other than "guess or surmise."
Proceedings leading up to the trial court's supplemental instructions began at 2:50 p.m. R. 392. The court gave the supplemental instruction at issue here and dealt with another question not at issue here, which consumed 12 pages of the court reporter's transcript. The record does not reflect what time the jury retired to recommence its deliberations, but it does show that the jury returned a guilty verdict at 4:00 p.m. R. 405. The speed with which the jury returned its verdict after the supplemental charge is an indication that it was strongly influenced by the court's additional instruction.
Even the federal courts, which acknowledge the trial judge's power to comment on the evidence, recognize that the power "is restricted and . . . subject to review." 3 W. LaFave J. Israel, Criminal Procedure § 23.6(c) at 41 (1984).
 "As the Supreme Court noted in Quercia v. United States [289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933)],
 " 'This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses.' "
W. LaFave J. Israel, id.
 " 'The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence "should be so given as not to mislead, and especially that it should not be one-sided"; that "deductions and theories not warranted by the evidence should be studiously avoided." * * * In the instant case, the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition. * * * He did not review the evidence to assist the jury in reaching the truth, but in a sweeping denunciation repudiated as a lie all that the accused had said in his own behalf which conflicted with the statements of the government's witnesses. This was error and we cannot doubt that it was highly prejudicial.' "
Cal-Bay Corp. v. United States, 169 F.2d 15, 22-23 (9th Cir.), cert. denied, 335 U.S. 859, 69 S.Ct. 134, 93 L.Ed. 406 (1948) (quoting Quercia v. United States, 289 U.S. at 470-72,53 S.Ct. at 699-700).
We cannot find that the trial court's instructions were harmless in this case. The court's hypothetical obviously paralleled Kenneth Hazelrig's version of the facts. That version was not only disputed by defense witnesses, but was also called into question by the attempted impeachment of Hazelrig with a prior inconsistent statement.
At trial, Hazelrig admitted that he had talked to Marshall Sheriff's Detective Edsel Whitten twice about the incidents underlying this prosecution. The first time, Hazelrig stated that he had been drunk all evening and "didn't remember nothing." R. 210. The second time, however, Detective Whitten had arrested Hazelrig for three unrelated offenses — burglary, theft, and possession of a forged instrument. At that time, Hazelrig told Whitten the same story he told at trial. Hazelrig denied that Detective Whitten threatened him or promised him anything in order to get him to give an account of the events at issue here. He did admit, however, that he was placed *Page 126 
on probation following guilty pleas to the three offenses. R. 211.
Under the circumstances, we think the trial court's hypothetical tended to bolster Hazelrig's testimony and to disparage the defense theory of the case, that the child had been injured by another party at another time. For this error, the appellant is entitled to a new trial.
The judgment of the circuit court is reversed and the cause remanded for proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
All the Judges concur.