Rel: March 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

————————————————

## CR-2024-0935

————————————————

### Jammie LaJoyce Hughes

**v.**

### State of Alabama

### Appeal from Jefferson Circuit Court, Bessemer Division
### (CC-20-466)

ANDERSON, Judge.

Jammie LaJoyce Hughes appeals her conviction for murder, a violation of § 13A-6-2(a)(1), Ala. Code 1975, and her resulting sentence as a habitual felony offender to life imprisonment. For the reasons that

follow, we reverse the judgment of the Jefferson Circuit Court, Bessemer Division.

Facts and Procedural History

On October 22, 2020, Hughes was indicted by a Jefferson County grand jury on one count of intentional murder, see § 13A-6-2(a)(1), Ala. Code 1975, for the stabbing death of Sidell Alstan Erskine on October 3, 2019. Because Hughes does not challenge the sufficiency of the evidence in this case, a brief recitation of the facts in this case is all that is required.

Jasmine Whitworth, Hughes's friend, testified that, on the afternoon of October 3, 2019, she was on the porch of Hughes's house with Whitworth's two children, waiting for Hughes to return home. Erskine came out of the door and told Whitworth that Hughes was not home yet and that Hughes "need[ed] to hurry up." (R. 267.) Whitworth stated that Erskine then went back inside the house and closed the door. Whitworth called Hughes, who explained that she was about to pull up at the house. When Hughes arrived, she told Whitworth and her two children to get into Hughes's vehicle to ride along while she drove Erskine to work. Whitworth and her two children got into the backseat of Hughes's

vehicle. Erskine then got into the vehicle and threw Hughes's purse. Whitworth stated that Hughes asked Erskine what was wrong and why he had thrown her purse. Whitworth testified that, as Hughes began to pull off, Erskine got out of the vehicle, slammed the vehicle's door, and returned inside the house.

According to Whitworth, Hughes then returned inside the house to see whether Erskine was still going to go to work; however, after Hughes went inside the house, Erskine came outside, got into the driver's side of the vehicle, and began driving away from the house and toward a stop sign, with Whitworth and her children still in the backseat of the vehicle. Whitworth explained that Erskine then stated "y'all ain't got nothing to do with this … I ain't fixing to kidnap y'all" (R. 269) before turning around to go back toward the house. While Whitworth was in the vehicle with Erskine, Hughes called Whitworth, crying, and stated that Erskine had slapped her. When Erskine pulled back up to the house, Hughes was standing outside the house in the yard. Erskine returned inside the house, and Hughes got into the driver's seat of the vehicle. Hughes told Whitworth that she was tired, that she was going to leave, and that Erskine was "not going to hit [her] anymore." (R. 271.) Whitworth

3

claimed that, at that point, she explained to Hughes that Erskine had grabbed the vehicle's keys before he returned inside the house, so Hughes returned inside the house to collect the keys.

Whitworth claimed that, five minutes later, Hughes ran back outside to the porch, screaming for help and telling Whitworth to call an ambulance. Whitworth got out of the vehicle, went inside, and saw Erskine lying on his side, bleeding, and struggling to breathe. Whitworth called emergency 9-1-1. A copy of the 9-1-1 call was played for the jury. Whitworth testified that, while she was on the phone with dispatch, Hughes was in the background saying: "Oh my God, I killed him. He should have stopped effing hitting me." (R. 275.) Whitworth also testified that, before law-enforcement officers arrived, Hughes moved Erskine from his side to his back.

Officers were dispatched to the scene around 2:00 p.m. When they arrived, Hughes was standing in the front yard with blood on her left hand. Hughes had "superficial" lacerations on her hands. (R. 96.) Officers testified that Whitworth and "a baby" were present at the scene. (R. 60.) Hughes told a responding officer that Erskine was inside the house and that he had stabbed himself. Officers went inside to find Erskine, who

4

was lying on his back on the floor, bleeding, with blood coming out of his mouth. Erskine appeared to have multiple stab wounds and was unable to talk. A silver knife was in his right hand. When the paramedics arrived shortly thereafter, they declared Erskine deceased. Officers discovered blood droplets on the floor of the house that appeared to go out the back door of the house and to a chain-link fence behind the house. A knife was discovered in the woods behind the house, and it appeared to have blood on both its blade and handle. Body-camera footage from the responding officers at the scene of the crime, which included Hughes's interactions with law-enforcement officers, was admitted into evidence and played for the jury.

Dr. Daniel Atherton, a forensic pathologist with the Jefferson County Coroner's Office, testified that he performed Erskine's autopsy. According to Dr. Atherton, Erskine had "approximately four or five different sharp force injuries" -- namely, "a large stab wound that was on the left side of his chest"; "some sharp force injuries on [his] left forearm and [his] left hand"; and "one in the right armpit area." (R. 399-400.) He also had "a small abrasion by his left eye." (R. 399.) The large stab wound on Erskine's chest went between two of his ribs, pierced both lobes of his

left lung, and "went all the way to the tenth rib on Erskine's back." (R. 402.) Erskine's blood-ethanol level was .22. Dr. Atherton opined that Erskine's cause of death was the "injury to the left lung due to the stab wound of the chest." (R. 425.)

Hughes testified in her own defense. Hughes explained that she and Erskine had been in a volatile relationship, that they shared a child together, and that Erskine had hit and beaten her multiple times throughout their relationship. She testified about multiple arguments and physical altercations that she and Erskine had been involved in before the day of the incident. Hughes claimed that, on the date of Erskine's death, she and Erskine had been arguing. That afternoon, while Hughes had been shopping, Whitworth arrived at her house and waited outside while Erskine remained inside the house. According to Hughes, she texted Erskine when she arrived at the house and he came outside to her vehicle so she could take him to work. Whitworth and her children got into the backseat. Hughes claimed that, when Erskine got into her vehicle, he threw her purse onto the floorboard. As Hughes began to drive away, he got out of the vehicle while it was moving and returned inside the house. Hughes told the jury that she followed Erskine

6

into the house, where she found him sitting on the couch. Hughes said that Erskine was angry and that he cursed her and hit her. Hughes explained that she initially responded by going outside the house, calling her mother, and crying while inside the vehicle, with Whitworth present. Hughes said that she was planning to leave the house until Whitworth informed her that Erskine had taken the keys to the vehicle with him.

Hughes said that when she returned inside the house to ask Erskine for the keys, she found him in the kitchen. They began arguing and Erskine continued cursing her and calling her names. Hughes testified that she took off a ring that Erskine had given her, placed it on the kitchen counter, and began to walk out the door. As she tried to leave, she said, she heard Erskine following her, which caused her to turn around to see him holding a knife. According to Hughes, that was the first time Erskine had pulled a knife on her while they were fighting. Hughes said that Erskine charged her with the knife and pushed her up against a window, causing it to break. She also said that Erskine was trying to hit her in the face while holding the knife in his right hand.

According to Hughes, Erskine swung at her with the knife and she grabbed it to avoid being struck. She said that she then pushed back

7

toward Erskine to keep them from "falling through the window." (R. 629.) As she and Erskine were struggling over the knife, Hughes said, she grabbed Erskine's right hand -- the one holding the knife -- and they fell to the ground. Hughes testified that, after they fell down, they "came apart" and Erskine walked off. (R. 631.) Hughes explained that she grabbed a silver knife from the windowsill, kept there for safety purposes, because she was "terrified," "scared," and "afraid" for her life. (R. 632.)

Hughes claimed that, when Erskine returned, she could see that he was hurt and that blood was coming out of his mouth. He fell to the ground and removed the knife from himself, at which point, she said, she took the knife from him, walked through the house, and threw the knife into the neighboring yard. Hughes explained that she threw the knife into the neighbor's yard because she was on probation and knew that she would "go to jail" for stabbing Erskine even if she was not guilty of a crime. (R. 634.) Hughes told the jury that she returned to check on Erskine and immediately began screaming and crying for help. Hughes admitted to placing the silver knife that she had been holding in Erskine's hand because she feared that she would "get shot" if law-enforcement officers walked in and saw her holding a knife. (R. 635.)

The jury found Hughes guilty of Erskine's murder, and the circuit court sentenced her to life imprisonment. This appeal followed.

Discussion

On appeal, Hughes argues that the circuit court abused its discretion because, she says, it commented on the evidence when it instructed the jury regarding the credibility of her testimony about the timing of her prior convictions. The reporter's transcript reflects that, during defense counsel's direct examination of Hughes, counsel asked Hughes whether she had any prior felony convictions. Hughes responded: "Yes. I have seven. And all my convictions [were] committed on one day in 2013. I broke in houses. I did. I admit to it. That day, I admitted to it. I didn't have money." (R. 581.) Hughes explained that she had gone to prison for "almost two years." (R. 581.) At the conclusion of Hughes's testimony, the jury was released for the day.

Outside the presence of the jury, the circuit court asked Hughes about her testimony that each of her prior felony offenses had occurred on the same day. The circuit court then brought to the parties' attention that its records showed that Hughes's prior felony convictions were

linked to at least four offense dates, and it asked Hughes for an explanation. The circuit court then stated:

> "THE COURT: … You gave the jury the impression it was one incident and sort of one act of bad judgment and that is how you ended up with seven felonies.
>
> "The fact is, these were all different incidents. They were different residences. Although, four of them were on the same date. In total there are four different dates. One of them being a good four years apart from the other.
>
> "So, the court finds that you have given willful, false testimony in this case. I find you in direct contempt of court for giving false testimony. I sentence you to ten days in the county jail."

(R. 704.)

The following morning, defense counsel asked the circuit court to set aside its finding of direct contempt, arguing that before holding Hughes in direct contempt the court should have given Hughes an opportunity to present evidence and mitigation. Defense counsel acknowledged that the trial court "could take judicial notice on [its] own volition"; however, counsel argued that the State had not yet had an opportunity to impeach her and that Hughes had not been given the due-process rights she was entitled to, including the ability to consult with counsel, before being held in contempt. (R. 708.) Defense counsel also

10

argued that by statute the circuit court could commit Hughes to only five days in jail for a direct contempt. The circuit court asked whether defense counsel was willing to offer evidence in mitigation at that time, to which he responded:

> "[Defense counsel:] I would like to be able to talk to her. We are not allowed to take laptops or electronics or anything into the jail right now. And we would have the opportunity, since we haven't rested, to recall [Hughes], if we chose to put her up there, to correct something she said or to say that after meeting with my attorneys, I now know X, Y, and Z. We aren't given that opportunity because we can't take anything in there electronic in there to show it to her."

(R. 709.)

After further discussion, the circuit court agreed to provide Hughes with an opportunity to present mitigating evidence. The following then transpired:

> "THE COURT: Well, I will give you a chance to meet with her and present any mitigating evidence you think I should consider. I also think I need to inform the jury that she gave false testimony. I need to remind the jury of what she said and then tell them what the facts are and they can decide whether that was a lie or whether what she said was false or intentional or not. I am not going to allow her to just come up here and correct the record on her own, giving the jury the impression that she did this of her own volition. That she -- it just dawned on her and she wanted to clear something up and she thought of that herself. That would be deceptive to the jury.

11

"[Defense counsel:] We wouldn't do that. If I did recall her, I would ask her did you meet with me. After meeting with me, what is the truthful answer to that or what is the correct answer to that. I am not going to have her commit a perjury. Again, they didn't impeach her with it.

"THE COURT: Right. When she said that, I looked at the State's counsel and they didn't seem to react. I think their mind was on something more substantive to the issue in this case [than] her background. But I immediately realized that those cases were in different jurisdictions, so they probably were not on the same date. In fact, one of them was years apart from the others. I knew that that was wrong. It doesn't surprise me that the State didn't point that out. If they had pointed it out and impeached her with it, I wouldn't feel the need to hold her in contempt or point out to the jury that she gave false testimony. Because they didn't, I think I need to point out to the jury that she has given false testimony. They are entitled to know that.

"[Defense counsel:] Obviously, Your Honor, we object to that. That would be the Court commenting on the evidence. I think that the State can do that and the State can say whatever they choose to say. We can produce certified copies of her convictions.

"THE COURT: I think if the State does it, it leaves the jury with the impression that it is an issue that is in dispute. It is not in dispute."

(R. 711-13.) After additional discussions about how the circuit court would instruct the jury regarding Hughes's false testimony, the defense rested and the State presented rebuttal evidence.

Later, outside the presence of the jury, the following occurred:

12

"THE COURT: Next, what is going to happen is, when the jury comes out, I am going to read them a statement reminding them of what she said and then just informing her of what the Court records reflect.

"[Defense counsel:] For the record, we would object to the Court doing that. We would ask that the Government be allowed to introduce whatever evidence they want and then argue it in their rebuttal case. I understand that is what the Court chooses to do and that is certainly your prerogative. For appellate purposes, we object to it coming from the bench."

(R. 732.) After additional discussion, the circuit court announced: "I think it is important that it does come from the Court so that the jury understands that this is not an issue that is in dispute, the dates of her arrest and the dates of those crimes." (R. 733-34). The court further explained: "If it just came from the State, it would sound like it is an allegation that they are making against her. The jury needs to understand that these are facts not in dispute." (R. 734.)

The circuit court then brought the jury back into the courtroom and, over Hughes's objection, gave the following instructions to the jury:

"THE COURT: … Ladies and gentlemen, before we proceed any further, I need to inform you of something. Yesterday on direct examination in response to a question from [defense counsel], Ms. Hughes gave some information that was not asked of her. [Hughes] said that all of her previous felonies happened on the same day, all at once.

13

"The fact is that according to the court records of the State of Alabama, [Hughes] was arrested on May 31, 2012[,] on four burglary cases, three of those were in the Bessemer Division of Jefferson County and one was in the Birmingham Division of Jefferson County.

"The Bessemer Division burglaries took place on May 24th, 2012[,] and the Birmingham Division burglary took place on May 29th of that year.

"On June 26th of 2012, she was arrested and charged with a burglary in the Birmingham Division that took place on April 10th, 2012.

"On April 24, 2013, she was arrested and charged with a burglary that took place again on May 24th, 2012.

"Then on May 10th, 2016, she was arrested and charged with a burglary in the Birmingham Division that took place on April 22nd, 2016.

"With that being said, does the State have anything to offer?"

(R. 735-36.) The court then allowed the State to introduce evidence in support of Hughes's previous arrests and charged crimes over Hughes's objection. Trial proceedings then continued, and the State presented other rebuttal evidence.

As stated previously, Hughes was convicted of Erskine's murder and was sentenced as a habitual felony offender to life imprisonment. On June 13, 2023, Hughes filed a motion for a new trial, requested the

14

recusal of the judge presiding over her case, and sought an evidentiary hearing on her motion for a new trial. In her motion for a new trial, Hughes alleged, among other allegations, that the circuit court had improperly commented on the evidence and her credibility as a witness when it instructed the jury on her testimony about her prior convictions instead of allowing the State to impeach her. The following day, Judge David Carpenter, the judge that had presided over Hughes's trial, recused himself from Hughes's case and transferred it to the Presiding Circuit Judge for reassignment. That same day, the case was reassigned to Judge Thomas E. Thrash.

Hughes filed a supplemental motion for a new trial, raising the same arguments that she had raised in her first motion for a new trial. The circuit court set the motion for a hearing on August 4, 2023.

On August 4, 2023, Judge Thrash granted an oral motion to continue the hearing, and a motion seeking his recusal, because he had been present during the jury-assembly process.[1] (C. 217.) On August 16, 2023, Hughes's case was reassigned to Judge Reginald L. Jeter. (C. 224.)

---

[1]Another issue raised in Hughes's motion for a new trial alleged improper comments by Judge Carpenter that allegedly had occurred during the jury-assembly process.

15

On August 23, 2023, Judge Jeter entered an order that provided, in pertinent part:

> "A review of the record indicates that a pending Motion for New Trial and Request for Evidentiary Hearing was filed by [Hughes] on June 13, 2023. More importantly, sentence was pronounced upon the Defendant on June 1, 2023. Pursuant to Rule 24.4, [Ala. R. Crim. P.,] '[n]o motion for new trial or motion in arrest of judgment shall remain pending in the trial court for more than sixty (60) days after the pronouncement of sentence, except ... with the express consent of the prosecutor and the defendant or the defendant's attorney, which consent shall appear in the record.' Accordingly, the instant Motion for New Trial was deemed denied by operation of law on or about July 31, 2023[,] unless there was an express consent by the parties. See Ala. R. Civ. P. 24.4 ('A failure by the trial court to rule on such a motion within the sixty (60) days allowed by this section shall constitute a denial of motion as of the sixtieth day.').
>
> "The instant record does not contain any such consent. Therefore, any orders subsequent to July 31, 2023[,] are a nullity as the instant motion was denied by operation of law on that date."

(C. 225.)

Hughes subsequently filed a Rule 32, Ala. R. Crim. P., petition seeking an out-of-time appeal from the circuit court's denial by operation of law of her motion for a new trial. The circuit court granted the petition and awarded Hughes the postconviction relief of an out-of-time appeal.

16

Turning to the issue presented, we initially consider the State's argument that Hughes's claim was not preserved for appellate review because, it says, she "did not argue below that the court's statements constituted an improper jury instruction, either at trial or in her motion for a new trial," and, "[t]hus, the trial court was not apprised of this issue so that it could make an informed decision on it." (State's brief, at 36.) We disagree that such semantics have application here.

Regardless of how Hughes classified the circuit court's statements to the jury -- either as merely improper comments or as a jury instruction -- defense counsel clearly and repeatedly objected to the circuit court's providing any statement, comment, or instruction to the jury as to the credibility of her testimony. (R. 711, 732.) Based on the record before us, the circuit court was clearly apprised of the basis for Hughes's objection so as to allow it to make an informed decision on the issue presented. See Cameron v. State, 615 So. 2d 121, 124 (Ala. Crim. App. 1992)(quoting Felder v. State, 593 So. 2d 121, 122 (Ala. Crim. App. 1991))("Although the appellant did not use the 'magic words' ... in stating his objection, the court was sufficiently 'inform[ed] ... of the legal basis of the objection, thereby affording the trial judge an opportunity to reevaluate his ...

17

[charge] in light of the grounds alleged and to change it, if deemed necessary.'"); see also Ex parte Weaver, 530 So. 2d 258, 259 (Ala. 1988) (quoting Bland v. State, 395 So. 2d 164, 168 (Ala. Crim. App. 1981)) ("The trial court must be apprised of the basis for the objection with sufficient particularity to allow an informed decision to be made on the particular legal issue involved."). Consequently, this issue is properly before this Court for review, and we will consider the merits of her claim.

This Court has held:

> "'"Each case of allegedly improper remarks by a trial judge must be judged on its own peculiar facts. Oglen v. State, 440 So. 2d 1172, 1175-76 (Ala. Crim. App.), cert. denied, Ex parte Oglen, 440 So. 2d 1177 (Ala. 1983); James v. State, 337 So. 2d 1332, 1341 (Ala. Crim. App. 1976)." Gamble v. State, 480 So. 2d 38, 40 (Ala. Crim. App. 1985). Even if a trial judge's statements are erroneous, "'[i]t cannot be seriously contended that every expression of opinion by the court, during the progress of the trial, ... shall furnish ground for reversal.' Lang v. State, 279 Ala. 169, 170, 182 So. 2d 899 (1966)." Gamble v. State, supra, at 40. "'Remarks by the trial judge may be open to criticism, but they are not error unless they have affected the result of the trial.'" Towns v. State, 494 So. 2d 798, 800 (Ala. Crim. App. 1986), quoting Cox v. State, 489 So. 2d 612 (Ala. Crim. App. 1985). See also McCovery v. State, 365 So. 2d 358 (Ala. Crim. App. 1978).'"

Dooley v. State, 575 So. 2d 1191, 1194 (Ala. Crim. App. 1990) (quoting McNeely v. State, 524 So. 2d 375, 380 (Ala. Crim. App. 1986)).

18

The State contends that it was the circuit court's "solemn and sacred duty" to address the jury regarding Hughes's false testimony and that it acted within its authority to "clear up the confusion Hughes caused with her false testimony." (State's brief at 41.) The State further asserts that the circuit court "did not tell the jury that Hughes lied or comment in any way on her credibility," because, it says, the circuit court "merely restated Hughes's testimony about the dates of her prior felonies," and disclosed what the court's records indicated regarding the dates of her prior felonies, while taking "no position on whether her testimony was intentionally false or simply mistaken." (State's brief at 41.) We disagree.

In support of its argument, the State relies, in part, on Quercia v. United States, 289 U.S. 466 (1933). In Quercia, which involved a trial in a federal trial court, "after testimony by agents of the government in support of the indictment," the defendant testified and denied all the charges against him. 289 U.S. at 468. The trial court later instructed the jury "concerning the rules as to the presumption of innocence and reasonable doubt, and stated generally that its expression of opinion on the evidence was not binding on the jury and that it was their duty to

19

disregard the court's opinion as to the facts if the jury did not agree with it." Id. The trial court then charged the jury as follows:

>    "'And now I am going to tell you what I think of the defendant's testimony. You may have noticed, Mr. Foreman and gentlemen, that [the defendant] wiped his hands during his testimony. It is rather a curious thing, but that is almost always an indication of lying. Why it should be so we don't know, but that is the fact. I think that every single word that man said, except when he agreed with the Government's testimony, was a lie.
>
>    "'Now, that opinion is an opinion of evidence and is not binding on you, and if you don't agree with it, it is your duty to find him not guilty.'"

Id. at 468-69.

The Court explained that,

>    "[i]n a trial by jury …, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. … In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. …
>
>    "This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He

20

may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury 'is necessarily and properly of great weight' and 'his lightest word or intimation is received with deference, and may prove controlling.' This court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.' Starr v. United States, 153 U.S. 614, 626 [(1894)]; Hickory v. United States, 160 U.S. 408, 421-423 [(1896)]. He may not charge the jury 'upon a supposed or conjectural state of facts, of which no evidence has been offered.' United States v. Breitling, 20 How. 252, 254, 255, 15 L.Ed. 900 [(1857)]. It is important that hostile comment of the judge should not render vain the privilege of the accused to testify in his own behalf. Hicks v. United States, 150 U.S. 442, 452, [(1893)]; Allison v. United States, 160 U.S. 203, 207, 209, 210, 16 S.Ct. 252, 255, 40 L.Ed. 495 [(1895)]."

289 U.S. at 469-70. The Court held that, under the facts presented by that case,

"the trial judge did not analyze the evidence; he added to it, and he based his instruction upon his own addition. Dealing with a mere mannerism of the accused in giving his testimony, the judge put his own experience, with all the weight that could be attached to it, in the scale against the accused. … He did not review the evidence to assist the jury in reaching the truth, but in a sweeping denunciation repudiated as a lie all that the accused had said in his own behalf which conflicted with the statements of the government's witnesses. This was error and we cannot doubt that it was highly prejudicial."

21

Id. at 471-72.

The United States Court of Appeals for the Eleventh Circuit, whose decisions are also cited by the State, has explained that a "trial judge is more than a referee to an adversarial proceeding" because a "judge may question witnesses, comment on the evidence, and interrupt the trial in order to correct an impropriety." United States v. Harris, 720 F.2d 1259, 1261 (11th Cir. 1983). To that end, a "judge's participation is limited only by the need to remain impartial. 'Only when the judge's conduct strays from neutrality is the defendant thereby denied a constitutionally fair trial.'" Id. at 1261-62.

This Court has also been called upon to determine whether a judge's comments to a jury were proper, including evaluating comments or remarks made in the presence of the jury, during the questioning of a witnesses, and during the court's jury instructions. For example, in Cameron v. State, 615 So. 2d 121, 123 (Ala. Crim. App. 1992), "[i]n a supplemental charge to the jury, the trial court used a hypothetical fact situation to explain circumstantial evidence and reasonable doubt," and "[t]he appellant argue[d] that the trial court's example so closely paralleled the State's version of the facts in the instant case that it

constituted a comment on the evidence and invaded the province of the jury." In analyzing whether the trial court's hypothetical example constituted error, this Court explained:

> "It is well-settled that 'the instructions of the court in a criminal prosecution must not invade the province of the jury.' 23A C.J.S. Criminal Law § 1293 at 198 (1989). The federal courts retain the power granted judges at common law to comment on the evidence and to express opinions on the facts. See Patton v. United States, 281 U.S. 276, 288, 50 S.Ct. 253, 254, 74 L.Ed. 854 (1930). Alabama, however, follows the rule that a judge may not comment on the evidence. § 12-16-11, Ala. Code 1975 ('[t]he court may state to the jury the law of the case and may also state the evidence when the same is undisputed, but shall not charge upon the effect of the testimony, unless required to do so by one of the parties'); Rule 21.1, Ala. R. Crim. P. ('[i]n charging the jury, the judge shall not express his opinion of the evidence'); C. Gamble, McElroy's Alabama Evidence, § 469.01 at 1030 (4th ed. 1991) ('[i]n charging the jury, it is the duty of the trial judge not to indicate, by the matter or manner of his charge, what his own views are as to the effect of the testimony')."

Cameron, 615 So. 2d at 124. This Court further stated:

> "Even the federal courts, which acknowledge the trial judge's power to comment on the evidence, recognize that the power 'is restricted and ... subject to review.' 3 W. LaFave & J. Israel, Criminal Procedure § 23.6(c) at 41 (1984).
>
> "As the Supreme Court noted in Quercia v. United States[, 289 U.S. 466, 470 (1933)],
>
>> "'"This privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be

23

> exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses."'

"W. LaFave & J. Israel, id."

Id. at 125. In that case, this Court determined that the trial court's instructions were erroneous, entitling the defendant to a new trial, because the court's hypothetical "obviously paralleled" a State's witness's version of the facts, which tended to bolster the witness's testimony "and to disparage the defense's theory of the case." Id. at 126.

In Mays v. State, 45 Ala. App. 337, 441, 230 So. 2d 248, 252 (Crim. App. 1970), this Court also held that

> "'[t]he question of the credibility of a witness is solely for the determination of the jury, and it is improper for the court to comment on or express an opinion directly or by implication of the credibility of the witness. The reason is that words or conduct of the trial judge may on the one hand support the character of testimony of a witness or on the other hand destroy the same in the estimation of the jury; and thus his personal and official influence is exerted to the unfair advantage of one of the parties with a corresponding detriment of the cause of the other.'"

24

(Citation omitted; emphasis added.) Similarly, the Alabama Supreme Court has instructed that "[i]t is improper for a trial judge to comment on the weight and effect of the evidence ... or on the credibility of a witness." Macon Cnty. Comm'n v. Sanders, 555 So. 2d 1054, 1059 (Ala. 1990). Although our Supreme Court found no error in Sanders, that was because it was "obvious that the trial court's comments were just joking remarks and were not comments on the evidence." Id. The same cannot be said for the circuit court's comments in this case.

In Jones v. State, 488 So. 2d 48 (Ala. Crim. App. 1986), the State presented witness testimony that the defendant shot the victim and admitted to another individual that he had shot the victim. The defendant, on the other hand, testified that he was intoxicated on the day of the shooting and did not remember anything. Other defense witnesses "cast suspicion on [a different suspect], who had 'meant' to cut the victim's throat the night before the shooting." Id. The defense also presented testimony that the defendant was not at the victim's house on the night of the shooting and was "too intoxicated to load the shotgun prior to the shooting." Id.

25

After the jury retired to deliberate, it requested that the trial court recharge them on the elements of murder and manslaughter. The trial court instructed the jury:

> "'Of course you know that [the victim] is dead. <u>Of course you know that [the defendant] shot him, because the evidence is not inconclusive there, it is as conclusive as it can be</u>.

> "'The only question as I see it that you could consider here is whether … [the defendant was] so intoxicated and so drunk and so under the influence of alcoholic beverages that he could not form the intent to take the life of [the victim].'"

<u>Id.</u>, at 48-49.

This Court explained:

> "The comment of the trial court constitutes error. A trial court has 'original, inherent power ... to direct the attention of the jury to the undisputed evidence.' <u>Tidwell v. State</u>, 70 Ala. 33, 44 (1881). See also <u>Rowe v. State</u>, 243 Ala. 618, 624-25, 11 So. 2d 749 (1943). Although a judge may instruct a jury 'that there is or is not evidence of particular facts when such is the case,' <u>Seibold v. State</u>, 287 Ala. 549, 562, 253 So.2d 302 (1970), a judge should not comment on the weight of the evidence or draw conclusions from disputed facts.

>> "'The weight to be given to evidence is wholly within the province of the jury, and any invasion of this province by the court in its orders is error; and any statement by the court, however unintentional, made in the presence of the jury, calculated to control the jury in its consideration of the weight to be given to testimony, will work a reversal, unless it be clearly shown that such remarks have been explained and excluded from

26

them. It may be thought that the criticism of the court is too restrictive and technical; but the principle involved is of such paramount importance, it would be dangerous to permit the least infringement of the rule to pass without correction. The separate province of the court and of the jury must be jealously guarded, and carefully recognized and preserved. It is an "anchor sure and steadfast" to protect those on trial for a violation of law, and to restrain the courts from the exercise of undue influence upon the juries, to whom is committed the important and exclusive right of weighing the evidence.' Griffin v. State, 90 Ala. 596, 8 So. 670, 673 (1890).

"See also Seibold, 287 Ala. at 562-63, 253 So. 2d 302. 'An [impermissible] charge upon the effect of the evidence is a charge which instructs the jury that certain facts in issue have been proved, or that certain evidence in the case does or does not establish a certain fact or facts in dispute, or directs the jury what their finding on an issue of fact must be if they believe the evidence in the case.' Yarber v. State, 437 So. 2d 1319, 1326 (Ala. Crim. App. 1981), reversed on other grounds, Ex parte Yarber, 437 So. 2d 1330 (Ala. 1983). '[I]f the evidence is in dispute, or affords conflicting inferences, it is reversible error for the court to charge on the effect of the evidence in the oral charge.' Cole v. State, 16 Ala. App. 55, 58, 75 So. 261 (1917). 'The court should so frame its oral charge as not to subject it to the criticism of it being the court's conclusion from facts in dispute. The court in a criminal case has no authority to take any material question of fact from the jury where there is any tendency in the evidence to support it.' George v. State, 240 Ala. 632, 638, 200 So. 602 (1941).

"The fact remains that however weak the defendant's case or however inconceivable his witnesses' testimony, the weight of that testimony is for the jury. In a criminal jury trial, only the jury can decide which witnesses to believe and

27

> which testimony to disregard. In a jury trial, the trial judge has no authority to determine disputed factual issues regardless of how personally convinced the judge might be of the 'truth' of one witness's testimony over that of another."

Jones, 488 So. 2d at 49.

In Wilson v. State, 461 So. 2d 918, 920 (Ala. Crim. App. 1984), a State's witness explicitly denied being afraid of the defendant during direct and cross-examination, and, afterward, the trial court questioned the witness by asking: "'Are you telling me that you are not scared?'" When the witness responded that he was not scared for himself because he witness would "'take care of myself,'" but that the case was affecting his mother, the trial court asked the witness whether he had been scared two weeks earlier when the court had talked to the witness after the case had been publicized in the newspaper. Id. The witness admitted that he had been scared at that time. Id.

This Court held that "the trial judge's questions were unnecessary to clarify the testimony of [the witness], who had "repeatedly stated that he was not afraid of the [defendant] or his brothers" and had "never waivered from this point," and that "the questions asked by the trial judge were not ones which would have been proper for the State to ask." Id. at 921 (emphasis omitted). This Court explained that "the implication

28

of the trial judge's questions was that [the witness] was not telling the truth on the stand and had told the trial judge a different story two weeks earlier in a private conversation." Id. at 922. Thus, citing Griffin v. State, 90 Ala. 596, 8 So. 670 (1890), this Court held:

"In this case, it was not the trial judge's place to discredit [the witness's] testimony. His questions of [the witness] introduced facts which were not in evidence and, thereby, he invaded the province of the jury as to the weight of the evidence. The trial judge's improper questions were a severe departure from the fair and impartial standard to which all judges are held and certainly prejudiced the substantial rights of this appellant.

"The able trial judge in this cause has a long record of distinguished legal service. His questioning here, however, went beyond the bounds of fair play."

Wilson, 461 So. 2d at 922.

On the record before us, we conclude that the circuit court's comments on Hughes's testimony were erroneous and prejudicial. The defense's theory of the case was that Hughes stabbed Erskine in self-defense. Although Whitworth was present at the time of the offense, she was outside Hughes's house and did not witness the stabbing. Hughes's own testimony, therefore, was a vital part of her defense, and the jury's determination regarding her credibility was a crucial factual determination. The circuit court's comments undoubtedly introduced

29

facts that were not already in evidence, going so far as to perform a function that the court admittedly believed should have been performed by the prosecution. In so doing, the circuit court went beyond the sort of "explaining" of the evidence that was discussed in dicta in Quercia. Instead, the circuit court effectively "assume[d] the role of a witness" and added to the facts before the jury. Quercia, 289 U.S. at 469-71.[2]

Additionally, although the circuit court did not explicitly tell the jury that Hughes was lying and represented that it was just "inform[ing]" the jury of the conflicting information in court records that were contrary to Hughes's testimony, see (C. 732), the comments, at the very least, implied that the circuit court had determined that Hughes's testimony was untruthful in regard to her prior convictions. Despite the circuit court's suggestion that it would simply "remind" the jury about Hughes's

---

[2]Even if, for the sake of argument, the dates of Hughes's prior offenses as determined by court records were admissible pursuant to Rule 201, Ala. R. Evid., the circuit court's stated purpose for personally informing the jury of those facts was inconsistent with the rule's requirements. As the circuit court explained it, "if the State [presented the evidence], it leaves the jury with the impression that it is an issue that is in dispute. It is not in dispute." (R. 713.) Rule 201, however, clearly protects the jury's constitutional role as the fact-finder in criminal cases by requiring a trial court to instruct the jury that "it may, but is not required to, accept as conclusive any fact judicially noticed." Rule 201(g). That was not done in this case.

testimony the previous day, inform the jury of the truth of the details of her prior convictions, and allow the jury to decide "whether what [Hughes] said was false or intentional," a trial judge's influence carries a great weight and the judge's "'"'lightest word or intimation is received with deference, and may prove controlling.'"'" Cameron, 615 So. 2d at 125 (citations omitted).

The effect of the circuit court's comments in this case was to clearly imply that Hughes had not told the truth during her testimony. In its explanation of why it believed the conflicting information in its possession should be given to the jury from the bench, and not through the State by way of impeachment, even the circuit court recognized the importance and influence its position in the eyes of the jury. (R. 713 ("I think if the State does it, it leaves the jury with the impression that it is an issue that is in dispute. It is not in dispute.").) Thus, whether intentional or not, the circuit court's comments generally served to directly discredit Hughes, to bolster the State's position, and to disparage the defense's theory of the case. See Cameron, 615 So. 2d at 126. However, it "was not the trial court's place to discredit [Hughes's] testimony." Wilson, 461 So. 2d at 922.

31

Consequently, we hold that the circuit court's conduct in this case strayed from the requisite neutrality expected of the judiciary, see Harris, 720 F.2d at 1262, was prejudicial to Hughes, and likely affected her substantial rights and the outcome of her trial. Consequently, the circuit court's judgment is reversed, and this matter is remanded for a new trial.[3]

REVERSED AND REMANDED.

Windom, P.J., and Cole and Minor, JJ., concur. Kellum, J., concurs in the result.

---

[3]We pretermit discussion of Hughes's remaining issue raised on appeal because we are reversing the circuit court's judgment and remanding this matter for a new trial based on our resolution of the issue addressed above that Hughes has raised.